DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, NY 10158
(212) 557-7200
David Wander, Esq. (dhw@dmlegal.com)
*Attorneys for Sheldrake Lofts LLC*
*Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| SHELDRAKE LOFTS LLC, | Case No. 10-23650 (RDD) |
| Debtor. | |

-------------------------------------------------------x

| | |
|---|---|
| SHELDRAKE LOFTS LLC, | |
| Plaintiff, | Adv. Pro. No. _____ |
| -against- | **COMPLAINT** |
| REMEDIATION CAPITAL FUNDING, LLC, RD MANAGEMENT, LLC, L&M DEVELOPMENT GROUP, LLC, ERIK EKSTEIN, JAY FURMAN, RON MOELIS, AND COZEN O'CONNOR, LLP, | |
| Defendants. | |

-------------------------------------------------------x

Plaintiff, Sheldrake Lofts LLC, debtor and debtor in possession, as and for its complaint against defendants Remediation Capital Funding, LLC, RD Management, LLC, L&M Development Group, LLC, Erik Ekstein, Jay Furman, Ron Moelis and Cozen O'Connor, LLP, alleges as follows:

## PARTIES

1.    Plaintiff is a limited liability company organized under the laws of the State of New York, and is the debtor and debtor in possession in this bankruptcy case, case no. 10-23650.

2.    Defendant Remediation Capital Funding, LLC **("RCF")** is a limited liability company organized under the laws of the State of New York.

3.    Defendant RD Management LLC **("RD Mgt")** is a limited liability company organized under the laws of the State of Delaware

4.    Defendant L&M Development Group LLC **("L&M")** is a limited liability company organized under the laws of the State of Delaware.

5.    Defendant Erik Ekstein **("Ekstein")** is an individual residing, upon information and belief, in the State of New York. Ekstein is a principal of RCF and RD Mgt.

6.    Defendant Jay Furman **("Furman")** is an individual residing, upon information and belief, in the State of New York. Furman is a principal of RCF and RD Mgt.

7.    Defendant Ron Moelis **("Moelis")** is an individual residing in the State of Connecticut. Moelis is a principal of RCF and L&M.

8.    Defendant Cozen O'Connor, LLP **("Cozen Firm")** is a business corporation organized under the laws of the State of Pennsylvania.

## JURISDICTION

9.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the "Standing Order of Referral of Cases to Bankruptcy Judges" (Ward, D.J., July 10, 1984)

10.    This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (K) and (O) and 1334.

11.    Venue is proper in this District and in this Court pursuant to 28 U.S.C. §1409(a).

## FACTS COMMON TO ALL CAUSES OF ACTION

***The Debtor's Chapter 11 Bankruptcy Filing***

12.     On August 10, 2010 (**"Petition Date"**), Sheldrake Lofts LLC (**"Sheldrake Lofts"** or **"Debtor"**) filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (**"Bankruptcy Code"**) in the United States Bankruptcy Court for the Southern District of New York ("Court").

13.     The Debtor has been authorized to continue in possession of its property and to manage its business as a debtor in possession under the Bankruptcy Code.

***Blood Brothers Auto Wrecking Business***

14.     For many years, Blood Brothers Auto Wreckers, Inc. (**"Blood Brothers"**) conducted an auto wrecking business at 270 Waverly Avenue (**"270 Waverly"**) in the Village of Mamaroneck (**"Village"**), New York.

15.     Blood Brothers was polluting the Sheldrake River, the groundwater and it had other environmental problems including two oil spills on the site.

16.     In 2004, Ofer Attia (**"Attia"**), the Debtor's principal, proposed replacing Blood Brothers with a residential development.

17.     Attia had an application filed with the Village Board of Trustees (**"Board of Trustees"**) to rezone the Blood Brothers property, along with an adjacent parcel of real property located at 147 Plaza Avenue (**"147 Plaza"**), from mixed use (M-1) to high density residential use (RM-3). The two commercial properties, 270 Waverly and 147 Plaza, along with three residential parcels located on Waverly Avenue, would comprise the Sheldrake Lofts project (**"Project"**)

18.     Approximately two years later, on August 28, 2006, after a lengthy environmental review process under the State Environmental Quality Review (SEQR) and extensive discussion and analysis, the Board of Trustees approved the rezoning of 270 Waverly and 147 Plaza.

19.    However, as part of the rezoning approval, the Board of Trustees required the Debtor to clean up the site, prior to construction, and the Village Planning Board (**"Planning Board"**) required the Debtor to remediate certain environmental problems at the Blood Brothers' property before final site plan approval would be given.

20.    In order for Sheldrake Lofts to receive a construction loan, it would first need final site plan approval from the Planning Board and then a building permit from the Village Building Department (**"Building Department"**).

21.    To meet the Village's demands, the Debtor needed to have Blood Brothers shut down, the car crushing machine and other heavy equipment removed along with all of the abandoned cars, and expensive environmental clean up work done.  In addition, with  Blood Brothers gone, the Debtor would be responsible for payment of real estate taxes, and other taxes by the Village, Town of Mamaroneck and school district.

22.    Accordingly, in order to move forward with the project before obtaining a construction loan, the Debtor needed bridge financing estimated at $6 million.

23.    Attia was then introduced to RCF as a potential source for the bridge financing.

*The RCF Loan*

24.    On or about February 26, 2007, Attia met Ekstein and Furman and, by the end of the meeting, they told him that RCF could close on a loan to Sheldrake Lofts in less than a week.

25.    Thereafter, RCF scheduled a closing for March 2, 2007.

26.    At the closing, on March 2, 2007, RCF had Sheldrake Lofts sign a note (**"RCF Note"**) for $6,635,000 (**"RCF Loan"**).

27.    However, RCF only advanced $5,396,285.71 of the RCF Loan at the closing, as follows:

> $   307,700.00   closing costs
> $4,639,964.71   payoffs for 270 Waverly, 147 Plaza and the residential properties
> $   448,621.00   Requisition No. 1

28.    RCF withheld $1,238,714.29 from the RCF Loan (**"Lender Hold-Back"**) for a 6-month interest reserve (**"Interest Reserve"**) totaling $447,335.29 and various soft costs totaling $791,379.00.

29.    Although RCF would pay the Interest Reserve and soft costs over time, RCF was charging interest on the Lender Hold-Back.

30.    The term of the loan was for a maximum of eighteen (18) months.

31.    The stated interest rate for the loan was 14% for the first six months, from March 2, 2007 to September 1, 2007, and 18% for the next twelve months, from September 2, 2007 to September 1, 2008. Also included in the RCF Note was a default rate of 24.5%.

**Delays with Site Plan Approval**

32.    By the time of the RCF closing, Sheldrake Lofts' and its land use attorney, Paul Noto, Esq. (**"Noto"**), who had extensive experience with the Village Planning Board, had already met with the Planning Board seven (7) times to review the proposed site plan. Since Sheldrake Lofts had already revised the site plan numerous times to accommodate all of the changes requested by the Board, Noto expected final site plan approval to be given at the next meeting of the Planning Board.

33.    On March 22, 2007, Sheldrake Lofts met with the Village Planning Board for the eighth time. However, once again, the Planning Board requested additional changes to the site plan.

34.     Thereafter, Sheldrake Lofts submitted a revised site plan dated April 9, 2007 and, on April 12, 2007, the Village's consultant, BFJ Planning (**"BFJ Planning"**), provided additional comments.

35.     The next month Sheldrake Lofts filed another revised site plan dated May 8, 2007 to address those comments.

36.     On May 16, 2007, a resolution was passed by the Village Harbor and Coastal Zone Management Commission declaring the project to be consistent with the Village's "Waterfront Revitalization Program" and finding that nothing in the project presented any adverse environmental impact.

37.     On May 18, 2007, the project was approved by the Village Board of Architectural Review.

38.     A meeting of the Village Planning Board was scheduled for June 14, 2007, at which time Sheldrake Lofts expected to receive final site plan approval.

39.     On June 13, 2007, Sheldrake Lofts provided "draft findings" to Bob Galvin (**"Galvin"**), the Chairman of the Planning Board, for the anticipated vote on final site approval at the June 14th meeting.

40.     However, at the June 14, 2007 meeting, the Planning Board did not vote on the final site approval and, after requesting additional changes to the site plan, adjourned the meeting to June 28, 2007.

41.     Thereafter, on or about June 25, 2007, Sheldrake Lofts provided the Village with a construction work-plan addressing construction traffic routing, public health and safety, worker health and safety and soil and groundwater management.

42.     On June 28, 2007, the Village Planning Board voted and gave Sheldrake Lofts preliminary site approval based on the revised site plan dated May 8, 2007, subject to certain conditions, including a modified traffic plan, maintenance plan, LEED certification, compliance with a new Village flood ordinance, marketing plan and various written confirmations on fire truck access, environmental, and engineering compliances.

43.     Sheldrake Lofts then expected to receive final site plan approval at the Planning Board's July 31st meeting.

44.     However, at the July 31, 2007 meeting, the Planning Board gave Sheldrake Lofts final site approval but made it conditional upon the Fire Council providing comments within thirty (30) days that Sheldrake Lofts would then have to address to the Planning Board's satisfaction.

45.     After a meeting with the Fire Council's representatives, on August 10, 2007, Sheldrake Lofts agreed to make additional amendments to the site plan in an effort to accommodate the Fire Council's comments.

46.     While Sheldrake Lofts was seeking final site approval, Attia was also negotiating with various lenders for a construction loan and received an accepted term sheet for construction financing from Corus Bank. In addition Attia was negotiating for a mezzanine loan that would payoff the RCF Loan.

*RCF Decides to Take Over the Project*

47.     Upon information and belief, on or about September 1, 2007, RCF applied the remaining funds in the interest reserve to cover the interest accrual for August 2007. However, upon information and belief, there was a shortfall of approximately $14,500 and, to cover this shortfall, RCF used funds that had been reserved for soft costs in the Lender Hold-Back.

48.    At all times after the closing for the RCF Loan, RCF received constant updates from Attia regarding Sheldrake Lofts' progress in obtaining final site plan approval and Ekstein and Furman appeared very supportive of Attia's efforts.  There had been no mention of any default under the RCF loan.

49.    Due to the delays in receiving final site plan approval, Attia advised Ekstein on October 2, 2007, that there would be a short delay in paying off the RCF Loan.  In addition, Attia requested RCF to advance additional funds to cover the increased "soft costs" that arose due to the changes in the site plan.

50.    Ekstein responded by telling Attia that he had to meet with him and Furman "to discuss your current situation and exit strategies – should that constitute the continued development of the property (with us or without us), your position as it currently stands with traditional lenders to take us out of our position, or a disposition of the property if need be."

51.    On October 3, 2007, Attia met with Ekstein and Furman and discussed the current situation and exit strategies.

52.    On October 16, 2007, Ekstein sent Attia a proposal whereby RCF would agree to advance $300,000 in for additional soft costs and "extend the accrual of interest for six months" during which time Sheldrake Lofts could obtain refinancing and payoff the RCF Loan; provided, however, that if the RCF Loan was not paid off within six (6) months, the RCF Loan would "roll over into an equity position" and RCF would takeover the entire project.

53.    Attia could not agree to RCF's proposal at that time due to the uncertain situation with the Village which Attia believed, but had no assurances, would be resolved in the near future.  Attia asked RCF for additional time to respond to their proposal when he had a better understanding of the status with final site plan approval.

54.     At that time, Sheldrake Lofts was revising the site plan in an effort to accommodate the requested changes by the Fire Council.

55.     RCF sent a default notice to Sheldrake Lofts dated October 29, 2007.  The default notice, however, stated that RCF did not "anticipate instituting a foreclosure action prior to January 15, 2008."

56.     Thereafter, Ekstein contacted Attia to request another meeting.

57.     On December 3, 2007, Attia met with Ekstein and Bob Paley (**"Paley"**) of L&M who Ekstein introduced to Attia as an "investor."  Attia then explained the entire project to Paley who asked for additional information.

58.     On December 5, 2007, Attia sent Paley detailed information about the project.

*Final Site Plan Approval*

59.     After Sheldrake Lofts made further changes to the site plan, in an effort to accommodate the Fire Council, its revised site plan dated December 4, 2007 was deemed to satisfy all the changes requested by the Planning Board when it gave conditional final site approval on July 31, 2007.

60.     On December 17, 2007, Sheldrake Lofts received final site plan approval from the Planning Board.

61.     On December 18, 2007, Attia notified Ekstein that Sheldrake Lofts received final site plan approval from the Village and would quickly move forward with the project so that Sheldrake Lofts could obtain a construction loan to payoff RCF.

*RCF Commences a Foreclosure against Sheldrake Lofts*

62.    The following day, on December 19, 2007, RCF filed a complaint against
Sheldrake Lofts, in the Supreme Court of the State of New York, Westchester County, seeking to
foreclose on the property for the Project **(the "Foreclosure")**.

63.    In the Foreclosure, RCF declared the RCF Loan to be in default as of September
1, 2007.

64.    At that time, however, RCF did not notify Attia about the Foreclosure .

*RCF Advances $240,000 to Sheldrake Lofts for the Village "Recreation Fee"*

65.    In order for Sheldrake Lofts to file its application for a building permit, it had to
pay the Village $240,000 as a "recreation fee" pursuant to a new law passed by the Village in
2007.

66.    In December 2007, Attia requested RCF to advance the funds for the recreation
fee and, on December 28, 2007, Ekstein and Furman agreed.   Shortly thereafter, RCF advanced
an additional $240,000 to Sheldrake Lofts.

*Building Permit Application Filed*

67.    On December 28, 2007, the Chairman of the Planning Board signed the final site
plan which was then filed with the Village, along with an application for a building permit.

68.    Pursuant to applicable local law, the Village Building Inspector was required to
approve or disapprove of the building permit application within a "reasonable time."

*RCF Takes Over the Project*

69.    In or around early January 2008, Attia found out about the Foreclosure and he
told Ekstein this would prevent Sheldrake Lofts from obtaining a construction loan to payoff the
RCF Loan.

70.    In response, Ekstein told Attia it was a "friendly foreclosure" and that Attia should have any construction lender contact RCF.

71.    Thereafter, Attia focused on preparing a construction budget with Sheldrake Lofts' construction manager, A. Pappajohn (**"Pappajohn"**) which included itemized costs for each part of the construction.

72.    On February 5, 2008, Sheldrake Lofts filed an answer to the Foreclosure.

73.    In March, 2008, Ekstein requested various information and documentation about the project, including the construction budget, he asked Attia for the contact information of the person marketing the project for Sheldrake Lofts, and he agreed to advance additional funds to pay various vendors covered by Sheldrake Lofts' Requisition No. 5.

74.    On April 14, 2008, Ekstein sent an email to Attia and Furman requesting that they all meet to discuss the status of the RCF Loan.

75.    On April 16, 2008, Attia met with Ekstein and Furman.

76.    On April 23, 2008, Ekstein contacted Sheldrake Lofts' land use attorney, without first notifying Attia, and inquired about the status of the approvals for the building permit.

77.    Also, in April 2008, RCF hired a law firm, Hocheman Tortorella & Wekstein LLP, to determine what approvals were needed to begin construction and, in May 2008, the firm sent RCF a detailed memorandum on the matter.

78.    On May 16, 2008, RCF requested the site plan from Attia.

79.    On or about May 28, 2008, Ekstein told Attia that, if he wanted RCF to advance additional funds, Charles Messi (**"Messi"**) of RD Mgt would be in charge of the construction project. Ekstein then instructed Messi to find out "the next steps we need to take to commence

construction." Messi then contacted Sheldrake Lofts' architect, Ray Sullivan **("Sullivan")** about the status of pulling permits.

80.     Meanwhile, on May 30, 2008, Ekstein signed an affidavit in support of a motion for summary judgment in the Foreclosure.

81.     On June 3, 2008, Messi contacted Sheldrake Lofts' architect and spoke to him without the consent or knowledge of Attia.

82.     On June 5, 2008, RCF filed a motion for summary judgment in the Foreclosure.

83.     On June 10, 2008, Ekstein and Messi met with Sheldrake Lofts' professionals, including its architect (Sullivan) and engineer (Craig Tompkins) **("Tompkins")**, and notified them that RCF would be running the project and that they would be reporting to Messi. Thereafter, Sullivan and Tompkins began reporting directly to Messi and Ekstein.

84.     On June 11, 2008, Messi asked Attia for the construction budget prepared by Sheldrake Lofts' construction manager.

85.     On June 12, 2008, Attia sent a requisition to RCF for additional advances, including payments to Sheldrake Lofts' professionals who attended the June 10, 2008 meeting.

86.     On June 20, 2008, RCF advised Sheldrake Lofts' professionals who attended the June 10, 2008 meeting that RCF would pay their past due amounts and for future work.

87.     On June 20, 2008, Messi sent an email to all of Sheldrake Lofts' professionals, except Pappajohn, stating they "are part of the Team to move this project forward."

88.     On June 25, 2008, Ekstein told Attia to send him written authorization for RCF to pay Sheldrake Lofts' vendors, stating these "funds fall under our current loan." On June 26, 2008 and June 27, 2008, RCF remitted payments to various vendors of Sheldrake Lofts.

89.     Thereafter, RCF negotiated directly with RCF's existing vendors regarding future work they would provide for the Project. For example, RCF negotiated directly with Collective Design Associates, LLC ("**CDA**"), Sheldrake Lofts' mechanical engineers, for future services and then sent the proposal they negotiated with CDA to Attia to sign on behalf of Sheldrake Lofts. Additionally, RCF hired additional vendors for the Project and usually advised Attia after the fact.

90.     On July 8, 2008, Messi sent an email to Sheldrake Lofts' architect, engineer and environmental consultant, without including or otherwise notifying Attia, and requested "a status of the permit issue."

91.     Shortly thereafter that same day, Messi sent an email to Attia advising him that RCF will not be using Sheldrake Lofts' construction manager, Pappajohn, and, in addition, he asked Attia for the names and contact information for all contractors Attia was considering for the project.

92.     On July 9, 2008, Mr. Messi sent an email to Sheldrake Lofts' engineer, Craig Tompkins, stating:

> Although we are running the project all contracts must be signed by Ofer. I've reviewed the contract and will cut a check covering the $6,000 deposit. Please revise the addressee and accepted signee and resend. I will arrange for Ofer to sign and return one copy for your records.

93.     Two days later, on July 11, 2008, Mr. Messi asked Tompkins to email Sheldrake Lofts' engineering plans to the following email address: garitocontract@aol.com.

94.     On July 14, 2008, Messi notified Attia that he was meeting a new contractor for the Project, Garito Contracting, Inc. ("**Garito Contracting**"), and told Attia "[t]hey've done a lot of work for us."

95.    On July 15, 2008, Messi conducted a "field meeting" at the project site with various professionals retained by Sheldrake Lofts as well as by Garito Contracting.

96.    The next day, on July 16, 2008, Mr. Messi scheduled a conference call for the Sheldrake professionals and others to discuss the progress of the project.

97.    On July 24, 2008, Messi told Attia that RCF arranged for Jim Garito "to draw" the foundation permit under Garito Contracting and that RCF would pay the necessary fee "on behalf of Attia."

98.    On July 24, 2008, Messi told Attia, after the fact, that RCF obtained proposals for construction fencing and debris removal, to secure and clean the site for construction, and that such work commenced the prior day.

99.    On July 24, 2008, Messi told Attia that a proposal for the demolition of 270 Waverly Avenue was being prepared and forwarded for his signature.

100.    On July 25, 2008, Messi told Attia that, as part of the construction of the project, he developed a scope of work that will stabilize the river bank with material that will remain in place and become part of the final landscaping.

*New Village Law Reducing FAR for New Construction Results
in Denial of Building Permit Application*

101.    Meanwhile, on May 12, 2008, the Village passed a new law, Local Law 5-2008 (**"New FAR Law"**), reducing the allowable FAR (floor area ratio) for new construction in the Village which became effective May 15, 2008.  However, Sheldrake Lofts was advised that the New FAR Law would not apply to its project.

102.    On or about July 18, 2008, Sheldrake Lofts received an appraisal of the proposed residential project from Leitner Group, Inc. valuing the property at $19,000,000.

103.   On July 22, 2008, after an unexplained six (6) month delay by John Winter ("**Winter**"), the Village Building Inspector, in reviewing Sheldrake Lofts' building permit application, the Village consultant for the project, Noel Shaw, recommended to Winter that a foundation permit be issued for the Project. Normally, such a recommendation would mean that Sheldrake Lofts' building permit application was being approved.

104.   However, a few days later, on July 25, 2008, Winter sent a letter to one of Sheldrake Lofts' architects stating that the New FAR Law would, in fact, apply to the Project and that Sheldrake Lofts' building permit application was not being approved at that time.

105.   RCF was immediately notified of these developments and Messi and Ekstein then became directly involved in developing Sheldrake Lofts' legal strategy to move the project forward.

106.   Throughout August and September of 2008, RCF continued to be very involved in moving the Project forward, particularly with respect to Sheldrake Lofts' efforts to obtain a Stream Permit from Westchester County.

107.   On September 26, 2008, Ekstein sent an email to Attia stating that Joel Arberman, Senior Vice President of RCF, would be supervising the project in the future.

***Denial of Sheldrake Loft's Request for an Extension of Site Plan Approval, Denial of Building Permit Application and Article 78 Proceeding***

108.   Due to the long delay by the Village regarding Sheldrake Lofts' building permit application, Sheldrake Lofts applied to the Planning Board for an extension of the one year deadline for construction to begin after final site plan approval.

109.   On November 13, 2008, the Planning Board denied Sheldrake Lofts request for an extension of final site plan approval and filed its decision with the Village Clerk on December 4, 2008.

00414727.2                              15

110.    On December 8, 2008, and then on January 20, 2009, Sheldrake Lofts' land use

attorney and architect filed applications with the Village Zoning Board of Appeals (**"ZBA"**),

challenging the Planning Board's December 4th decision, and a hearing was scheduled by the

ZBA for February 5, 2009.

111.    Also, on December 31, 2008, Sheldrake Lofts, by its attorney Glenn Allyn, Esq.

(**"Allyn"**) of the law firm Allyn, Hausner & Montanile, PLLC, filed an Article 78 proceeding

with the Supreme Court of the State of New York, County of Westchester, Index No. 08-27823,

challenging the Planning Board's December 4th decision.

112.    On February 5, 2009, the ZBA held a public hearing on Sheldrake Lofts'

application and reserved decision.

113.    On February 26, 2009, a Judgment in RCF's "friendly foreclosure" was entered

by the Westchester County Clerk.

114.    On or about April 1, 2009, the ZBA issued a decision denying Sheldrake Lofts'

application.

115.    Thereafter, Allyn agreed to file an Article 78 proceeding from the ZBA decision

and requested payment of a $5,000 retainer.

116.    RCF agreed to pay Allyn's retainer and cover the legal fees for both Article 78

proceedings.

117.    On May 11, 2009, Allyn filed an Article 78 petition for Sheldrake Lofts, in the

Supreme Court of the State of New York, County of Westchester, seeking, among other things:

(i) a finding that Sheldrake Lofts acquired a vested right to pursue the development of the

Project, (ii) ordering the Village to issue a building permit for the Project, (iii) reversing the

decision of the ZBA, which denied Sheldrake Lofts' request for a variance in respect to Section

342-38 of the Zoning Code, and (iv) to provide Sheldrake Lofts with a variance from the FAR
requirements under the New FAR Law.

### RCF Takes Over Control of the Article 78 Proceedings

118.    Beginning in or about May, 2009, Ekstein began communicating directly with
Allyn and, thereafter, took over control of the Article 78 proceedings.

119.    After Allyn requested that RCF enter into a formal retainer agreement with his
firm, Ekstein sent him an email, on December 17, 2009, stating they would soon finalize his
retention and strategize on "next steps."

120.    On December 16, 2009, the Village filed an answer in both of the Article 78
proceedings.

121.    However, on December 22, 2009, Ekstein sent an email to Allyn advising him
that the Cozen Firm would be substituted as counsel for Sheldrake Lofts and that Kenneth
Roberts, Esq. (**"Roberts"**), a partner at the firm, would prepare the substitution papers.

122.    Several weeks then passed without any substitution papers being delivered to
Allyn.

123.    On January 6, 2010, Allyn received a letter from the attorney for the Village
handling the Article 78 proceedings, advising that the court requested the parties to provide a
date in January for a conference on the matters and proposing three dates at the end of the month,
and, on January 7, 2010, Allyn emailed this letter to Ekstein and Roberts, stating: "I was advised
that I would be substituted before the holidays, but there has been no such substitution as of this
point." Allyn also requested payment of his outstanding invoice in the sum of $5,309.00.

124.    On January 13, 2010, after a substitution of attorneys still had not been received,
Allyn sent an email to Ekstein stating he would make an application to be relieved as counsel

and for payment of attorneys fees if he did not have a consent to change attorney by January 15,

2010 along with payment of his outstanding invoice.

125.    Ekstein responded with an email to Allyn, on January 13, 2010, stating:

> You do not work for me and I did not hire you.  You were hired by
> Ofer Attia on behalf of Sheldrake and only Ofer can determine
> whether you are owed the money you ask for.

126.    On January 15, 2010, RCF sent a proposed letter agreement to Attia regarding

their discussions concerning the Article 78 proceedings and the substitution of the Cozen Firm.

Attia told Ekstein he wanted to make a few changes and then he would sign the proposed

agreement.  Attia also told Ekstein he wanted to meet with Roberts and stated:  "Please make

sure that every step and communication I am in the loop, side by side with you – although he is

paid by you."

127.    Later that day, Attia had a telephone call with Roberts who said he would

schedule a meeting with him.  In addition, Roberts told Attia he would also schedule the court

conference for the Article 78 proceedings.

128.    On January 26, 2010, Ekstein sent Attia a revised letter which they both signed,

stated in part:

> You have been dissatisfied with the lawyer presently representing
> [Sheldrake Lofts] and don't have the funds to retain a new lawyer.
> We will engage Ken Roberts of Cozen O'Connor to represent
> [Sheldrake Lofts] and will pay for his services.  We will coordinate
> the proceedings and any decision with you.

129.    On January 26, 2010 Attia and Ekstein had a conference call with Roberts.

Among other things, Attia stated that he wanted to meet with Roberts as soon as possible so Attia

could provide him with information about the Project and the Article 78 proceedings.

130.    On January 28, 2010, Allyn sent an email to Ekstein and Roberts stating: "Please stop playing games. Get a new attorney by next Tuesday and pay me $5,309.00 [or] I will make an application with the court next week to withdraw as counsel and file a lawsuit for attorney's fees... ."

131.    On January 29, 2010, Ekstein told Roberts to "make a deal with [Allyn] and Remediation will pay the money." Roberts, however, did nothing for almost six (6)weeks.

132.    On February 8, 2010, Ekstein sent an email to Roberts asking about the Article 78 proceeding and change of attorneys and Attia followed up, on February 11, 2010, with an email to Roberts asking about the substitution of counsel and the court conference that was to have been held in January 2008. Roberts responded later that day with an email to Attia and Ekstein stating "the court conference never happened, and no new date has been set yet." Apparently, Roberts had not even sent Allyn a consent to change attorneys.

133.    On or about March 8, 2010, Attia found out that the Village wanted to have a meeting with Sheldrake Lofts, and he was advised that the Village could not get a response from Roberts. Immediately thereafter, Attia sent an email to Roberts and Ekstein advising them of this development with the Village and he suggested the three of them meet or have a conference call to develop their strategy.

134.    Later that day, Roberts contacted the Village Attorney, Christie Derrico, Esq. (**"Derrico"**) and they had a very brief discussion that they continued the next day.

135.    On March 9, 2010, Roberts spoke again with Derrico and they agreed to meet to discuss a settlement of the Article 78 proceedings. Roberts then sent an email to Attia and Ekstein asking "[o]n what terms would you settle?"

136.    On March 9, 2010, before Attia found out about this second telephone call between Roberts and Derrico, he sent an email to Ekstein and Roberts reminding them that he had requested a meeting or conference call to discuss strategy.

137.    Roberts subsequently sent an email to Attia agreeing to meet after he was substituted as counsel for Sheldrake Lofts.

138.    However, Ekstein sent an email to Attia saying they should first have Roberts speak with Derrico "and get the lay of the land before we agree to do anything."  Ekstein made it clear that he wanted all communications to go through Roberts stating: "I also recommend that you do not speak to them at all right now.  Just give them Ken's number."

139.    Attia responded with an email to Ekstein explaining why he felt it was important that they first meet with Roberts, stating:

> ...this is a new administration and new village atty.  Had no relation or history of the previous meeting. We have to discuss it first as there is many ramification for such ignition/"setting the stage" meeting. *[sic]*

140.    Meanwhile, Ekstein was communicating with Roberts alone.  On March 9, 2010, Ekstein sent an email to Attia stating:

> Ken assures me that our case is not in any jeopardy at this time.  I do agree that we should speak, but I would like to hear what Ken learns from the town in his initial conversations without us.  I know you are anxious, understandably, however I would rather the town not know that.
>
> As I just told Ken, I do not even want to discuss settlement until we have a real grasp of what the town is offering.  We already made our offer when we filed the [Article] 78.

141.    On or about March 12, 2010, Roberts finally met with Allyn, gave him a check for his outstanding invoice, obtained his files and, thereafter, filed the substitution of attorney papers.

00414727.2                                20

142.    On March 12, 2010, Mr. Roberts sent an email to Ekstein and Attia stating they "should talk strategy next week."

143.    Thereafter, Roberts began conducting clandestine negotiations with the Village on behalf of RCF without Attia's knowledge or consent.

144.    On or about April 8, 2010, Attia sent an email to Ekstein and Roberts asking if there were any updates and Roberts responded with an email advising Attia, for the first time, that he had met with Derrico and that both and he and Derrico were "both thinking of settlement possibilities."

145.    Upon information and belief, Ekstein knew about this meeting in advance.

146.    Attia then sent Roberts an email, on April 8, 2010, asking why he had not informed about the meeting and settlement discussions.

147.    On April 16, 2010, Attia finally met Roberts at his law office, along with Ekstein, and they discussed strategy for the negotiations with the Village.  Attia discussed a list of items he told Roberts to ask for including: a building permit, a 5-year extension for construction to be completed, a tax abatement, dropping the requirement for six (6) affordable units, permission to use 270 Waverly and 147 Plaza for other commercial purposes on a short-term basis, and payment of damages.

148.    At the meeting, Roberts suggested that Sheldrake Lofts obtain an attorney on a contingency basis to pursue a separate action for a damage claim against the Village.

149.    Also, at the April 16, 2010 meeting, Attia and Ekstein discussed the rental income currently being generated by the residential properties.  Attia suggested that the revenue could be increased through rental of the commercial properties, in order to have additional funds for payment of legal fees and real estate taxes.

150.    Ekstein had been aware, at all times prior and subsequent to the Foreclosure, that Attia was collecting the rents from the residential properties, using the monies to maintain those properties and pay other necessary and reasonable expenses.  Ekstein never objected to such use of the rental income.

151.    When the meeting ended, Attia left Roberts' office but Ekstein stayed behind, claiming that he and Roberts had unrelated matters to discuss.

152.    On April 19, 2010, Attia sent Roberts various documents relating to the claims in the Article 78 proceedings.

153.    Upon information and belief, sometime in the latter part of April 2010, Roberts had a phone call with Derrico and the attorney representing the Village in the Article 78 proceedings, Arturo Boutin, Esq. (**"Boutin"**).  Further, upon information and belief, Roberts asked for most, if not all, of the items requested by Attia except for the payment of damages.

154.    Roberts never told Attia about his conversation with Derrico and Boutin.

155.    On May 6, 2010, Attia called Roberts and asked him about the status of obtaining a contingency lawyer to pursue Sheldrake Lofts' damage claim against the Village, and Roberts told Attia he was working on the matter.

156.    On May 12, 2010, Attia again called Roberts about the status of the contingency attorney but was advised that there was no progress on the matter.

157.    On May 14, 2010, Attia found out from a third party that a court conference was scheduled for the Article 78 proceedings and he sent an email to Roberts to find out what was going on.

158.    Roberts responded, on May 19, 2010, by sending an email to Attia stating: "There's nothing to report in your case – still waiting to hear from the Village attys as to what terms they're proposing for settlement."

159.    In his May 19, 2010 email, Roberts also told Attia that the contingency lawyers he spoke with were not interest in representing Sheldrake Lofts because its "claims are owned by the lender by virtue of the foreclosure judgment."

160.    Roberts ended his May 19, 2010, email stating:  "I've thought about this a lot but can't figure any way you or Sheldrake can get any money out of this."

161.    Attia then sent Roberts and email, on May 19, 2010, asking about the status of the court conference for the Article 78 proceedings, and Roberts responded by stating he was trying to confirm the conference with the court and that he would let Attia know when he knew what was happening.

162.    Upon information and belief, a court conference in the Article 78 proceedings was scheduled for May 28, 2010 but Roberts did not tell Attia until after the fact.

163.    Upon information and belief, Roberts tried to adjourn the May 28, 2010 conference but the court refused.

164.    On May 28, 2010, Roberts sent an associate to the court conference who, upon information and belief, knew very little about the matter.  Further, the court adjourned the matter for almost five months, to October 8, 2010, upon information and belief, without objection by the attorney from the Cozen Firm.

165.    On June 2, 2010, Attia called Roberts and said he was very upset about the very long adjournment and asked what the next steps would be.  Roberts responded that he was waiting for a proposal from the Village before the next court hearing on October 8, 2010.

166.    Unbeknownst to Attia, Roberts then scheduled a meeting with the Village Attorney for June 22, 2010.  The meeting would also include other representatives of the Village, such as Galvin and Keith Furey **("Furey")**, the Village's engineering consultant.  Various representatives of RCF and L&M were also invited to the meeting by Roberts.  The single purpose of the meeting was to discuss the development possibilities on the site.

167.    In preparation for the meeting, Furman sent an email to Moelis on June 16, 2010, stating that he was trying to contact an architect at SLCE Architects located in Manhattan.  In addition, Furman stated: "I do not know who is going to the meeting with Ken." Ekstein responded by telling Furman that he and Moelis were going to the meeting with Roberts.

### The June 22, 2010 Meeting

168.    On June 22, 2010, Roberts, Ekstein and Moelis, along with the Chief Operating Officer of L&M, Debbie Kenyon **("Kenyon")** attended a meeting with Derrico, Galvin, Winter and Furey.

169.    Upon information and belief, at the time of the meeting, Winter thought that RCF had taken over ownership of Sheldrake Lofts' property.

170.    According to Galvin's sworn testimony, Moelis did most of the talking for RCF, and he did not recall Roberts speaking at all.  Galvin assumed that Roberts was "part of L&M" and his impression was that Roberts, Moelis and Ekstein "were all together on the same team."

171.    Also, according to Galvin, there was no discussion about settling the Article 78 proceeding with a payment by the Village or otherwise.

172.    At the end of the meeting, Moelis "indicated they were going to have their architect Mr. Sullivan show a tentative site plan [at the next meeting] as to what they were thinking."

*Roberts June 22, 2010 Emails to Attia*

173.    After the meeting on June 22, 2010, Roberts sent an email to Attia advising him

for the first time about his meeting with the Village Attorney.  In this email, Roberts did not tell

Attia that RCF's principals attended the meeting with him, or that anyone else was there.

Roberts' June 22, 2010 email stated:

> ... I met with the Village Attorney again today and the Village
> isn't offering any money to settle.  In addition, she said they can't
> approve the permit application as submitted because the Fire Code
> was amended and results in a decrease in the amount of
> permissible units on this site to approx 75.  Also, she said that your
> direct communications with the Village are hurting your cause and
> that all communications should be through the lawyers.

174.    Roberts' email was false and misleading because, according to the sworn

testimony of Derrico, Galvin and Winter, the issue of the Village "offering any money to settle"

was never raised at the meeting by Roberts or anyone else.

175.    When Attia sent Roberts an email asking his "thoughts" on what the Village

Attorney said, Roberts responded by email, on June 22, 2010, stating: "As I've said – I can't

figure out how to get you anything out of the Art. 78s. If you or anyone else have any ideas

please let me know."

176.    When Attia then sent Roberts another email asking his "opinion" about what the

Village Attorney said about the fire codes and a reduction of the units, Roberts dodged the

question, even though Ekstein had told Attia that Roberts had experience as a land use attorney,

stating "[t]hose issues are beyond my expertise – we'd need an opinion of an architect and a

zoning lawyer."  Roberts deliberately failed to mention any discussion of these issues by other

people who attended the June 22, 2010 meeting.

177.    In emails to Attia, on June 22, 2010, Roberts never once mentioned the scheduling of a follow up meeting between the Village and RCF.

178.    Thereafter, on June 28, 2010, Attia had a phone call with Roberts and, among other things, they again discussed the June 22, 2010 meeting with the Village. Once again, Roberts failed to mention that RCF's principals attended the meeting with him.

*RCF Hires a Tax Certiorari Attorney Without Attia's Knowledge*

179.    After avoiding Attia's phone calls and emails for over a month, on June 24, 2010, Ekstein suddenly called Attia with Joel Ditchik, Esq. (**"Ditchik"**), a tax certiorari attorney, on the phone and Ekstein then introduced Attia to Ditchik.

180.    Unbeknownst to Attia, RCF had already hired Ditchik and his firm to file an administrative protest on behalf of Sheldrake Lofts against the Town of Mamaroneck's 2010 tentative tax assessments for its property. Upon information and belief, Ditchik had tried to file the necessary papers without Attia's knowledge but was unable to do so without Attia's signature.

181.    Therefore, Ekstein and Ditchik called Attia to have him sign the necessary papers.

182.    In this phone call, Ekstein never mentioned the June 22, 2010 meeting with the Village or a follow up meeting that had been scheduled for July 20, 2010.

*RCF Contacts Sheldrake Lofts' Architect*

183.    On June 29, 2010, Ekstein called Sullivan, the architect for Sheldrake Lofts, without Attia's knowledge.

184.    In this call, Ekstein acted as if RCF had ownership of Sheldrake Lofts' property and was moving forward to develop it.

185.    Upon information and belief, on June 29, 2010, Moelis also called Sullivan.

186.    Ekstein and Moelis induced Sullivan to assist RCF in preparing for its follow up meeting with the Village by holding out the prospect of RCF hiring Sullivan as their architect for the project.

187.    Almost immediately thereafter, on June 29, 2010, Sullivan called Galvin, the Chairman of the Planning Board, to obtain information for RCF and its proposed development of the Sheldrake Lofts project.  Sullivan and Galvin discussed various issues that were important to RCF, including the number of units that could be built, an extension of the time for obtaining necessary approval, and a repeal of the New FAR Law's treatment of "parking under a structure."

188.    Sullivan then reported back to Ekstein and Moelis, on June 29, 2010, regarding his discussion with Galvin.

189.    Two days later, on July 1, 2010, Sullivan sent Ekstein and Moelis a proposal for his services as RCF's architect on the project.

***RCF Schedules a Foreclosure Sale***

190.    On July 14, 2010, six (6) days before their next scheduled meeting with Roberts and the Village, RCF noticed a foreclosure sale of Sheldrake Lofts' property for August 11, 2010.

191.    However, upon information and belief, RCF failed to serve Attia with the notice of foreclosure sale.

192.    Neither Ekstein nor Roberts told Attia about the notice of foreclosure sale.

193.    As a result, Attia did not find out about the foreclosure sale until July 27, 2010.

***Attia Finds Out About the July 20, 2010 Meeting***

194.    On Friday, July 16, 2010, Attia met with Winter regarding a dispute concerning Sheldrake Lofts' use of the commercial properties.  During the meeting, Attia found out that a meeting between the Village and RCF had been scheduled for the following week.

195.    Attia immediately tried contacting Roberts, without success, to find out what was going on.  He continued attempting to contact Roberts over the weekend, but Roberts ignored all of Attia's phone calls and emails.

196.    On Monday morning, July 19, 2010, Roberts finally responded to Attia's email from the previous day inquiring about the time and place of the Village meeting and who was expected to attend.

197.    In a response email, Roberts stated:  "There's a meeting tomorrow at which the Village will be discussing with the lender an amended site plan they may proceed with after foreclosure" but he did not tell Attia when and where the meeting would be held.

198.    Attia then sent an email to Roberts advising him that Attia was planning to attend the meeting and, in another email, Attia asked him for the time and place.

199.    Roberts responded with an email telling Attia the meeting would be held at the Village Hall at 9:30 a.m. but that he was not invited.  Roberts' email stated: "… the Village has made clear that, based on prior experience with you, they don't want you at any meetings."

200.    No longer trusting Roberts, Attia called the Village Attorney's office to confirm the time and place of the meeting.  He spoke with Derrico who bluntly told him that he was not invited to the meeting.

201.    When Attia protested, stating that he should be allowed to attend if Sheldrake Lofts' attorney was at the meeting. Derrico told Attia that she thought Roberts was RCF's attorney.

202.    According to Roberts, he then received a call from Derrico disinviting him from the meeting.  Roberts then sent an email to Attia stating:

> I just received an irate call from the Village Attorney.  Your phone call caused the Village to disinvite me from the meeting tomorrow. It's now a meeting with the lender only.  I had told you not to speak to the Village directly.  I can't represent you if you don't follow my advice.

203.    Shortly thereafter, on July 19, 2010, Roberts sent another email to Attia, notifying him that Roberts would no longer be representing Sheldrake Lofts, stating:

> When I took the case Sheldrake's interests were aligned with the lender's but now it appears they're not, so I can't represent Sheldrake any more.

### The July 20, 2010 Meeting

204.    On July 20, 2010, in the morning, Attia showed up at the Village Hall and found out that the meeting was taking place at another Village building where the Village offices were located.

205.    Attia spoke with Derrico in the lobby and she told Attia that they were having an internal meeting and that he was not invited.  When Attia protested, she told him to leave the building.

206.    While waiting outside, to his surprise, Attia saw Sullivan approach the building carrying what appeared to be architectural drawings.  Attia confronted Sullivan and found out he was coming from a meeting with Moelis and that RCF had asked Sullivan to attend the meeting with the Village.

207.    Shortly thereafter, Attia saw Moelis approach the building and Attia introduced himself. He told Moelis that Derrico would not let him attend the meeting and that Moelis should not attend the meeting if Attia was not present. Moelis refused and told Attia he should speak with Ekstein when he returned from his vacation.

208.    Attending the meeting for RCF was Ron Moelis, three employees of L&M, including Kenyon, and Sullivan.

209.    Attending the meeting for the Village was Derrico, Galvin, Winter, Furey and Susan Faunte of BFJ Planning.

210.    At the meeting, Sullivan produced a site plan containing Sheldrake Lofts' name and that had been slightly modified from the Sheldrake Lofts site plan, to show a similar configuration of buildings that were slightly smaller than the buildings for which Sheldrake Lofts received final site plan approval. Sullivan put the site plan on the table so that everyone could view it.

211.    At the meeting, Moelis acted as if he had ownership of the Property.

212.    After the meeting, Sullivan continued to develop a site plan for RCF, believing that RCF already owned the property.

## FIRST CAUSE OF ACTION AGAINST RCF
### [equitable subordination]

213.    Plaintiff repeats and realleges the allegations in paragraphs "1" through "212" above as if set forth in full herein.

214.    RCF exercised sufficient domination and control over Sheldrake Lofts to be considered an "insider" for equitable subordination purposes.

215.    RCF exercised managerial control over Sheldrake Lofts.

216.    RCF made personnel decisions for Sheldrake Lofts.

217.   RCF decided which creditors should be paid.

218.   RCF was Sheldrake Lofts sole source of credit.

219.   RCF engaged in inequitable conduct.

220.   RCF's conduct shocks one's good conscience.

221.   RCF's misconduct resulted in harm to all creditors of Sheldrake Lofts and conferred an unfair advantage on RCF.

222.   General unsecured creditors are less likely to collect their debts as a result of RCF's inequitable conduct.

223.   Equitable subordination of RCF's claim is consistent with bankruptcy law, based upon 11 U.S. C. § 510(c).

224.   Accordingly, RCF's claim should be subordinated to other creditors and RCF's lien on Debtor's property should be transferred to the estate.

## SECOND CAUSE OF ACTION AGAINST COZEN FIRM
### [breach of fiduciary duties]

225.   Plaintiff repeats and realleges the allegations in paragraphs "1" through "224" above as if set forth in full herein.

226.   The Cozen Firm had an attorney-client relationship with Sheldrake Lofts as its attorneys of record for the Article 78 proceedings.

227.   Accordingly, the Cozen Firm owed a fiduciary duty to Sheldrake Lofts.

228.   The Cozen Firm breached its fiduciary duty to Sheldrake Lofts.

229.   The Cozen Firm breached its fiduciary duty to Sheldrake Lofts by failing to zealously advocate its client's interests.

230.   The Cozen Firm breached its fiduciary duty to Sheldrake Lofts by advocating the interests of RCF in contravention to the interests of Sheldrake Lofts.

00414727.2                                    31

231.   The Cozen Firm breached its fiduciary duty to Sheldrake Lofts by conducting negotiations with the Village without disclosing the content of those negotiations to Sheldrake Lofts or Attia.

232.   The Cozen Firm breached its fiduciary duty to Sheldrake Lofts by conducting negotiations with the Village without the knowledge or consent of Sheldrake Lofts or Attia.

233.   The Cozen Firm breached its fiduciary duty to Sheldrake Lofts by having discussions with RCF, RD Mgmt and L&M, through their principals, Ekstein, Furman and Moelis, regarding the Article 78 proceedings and negotiations with the Village without disclosing the content of those negotiations to Sheldrake Lofts or Attia.

234.   The Cozen Firm breached its fiduciary duty to Sheldrake Lofts by failing to take any action to prosecute the Article 78 proceedings.  The Cozen Firm failed to file a reply to the answer by the Village and the Cozen Firm deliberately delayed the proceedings.

235.   As a result of the Cozen Firm's breaches of the fiduciary duty owed to Sheldrake Lofts, Sheldrake Lofts suffered substantial damages in an amount to be determined at trial, but believed to be in excess of One Million Dollars ($1,000,000).

### THIRD CAUSE OF ACTION AGAINST RCF, RD MGT, L&M, EKSTEIN, FURMAN AND MOELIS
[aiding and abetting breach of fiduciary duties]

236.   Plaintiff repeats and realleges the allegations in paragraphs "1" through "235" above as if set forth in full herein.

237.   RCF, RD Mgt and L&M, through their principals, Ekstein, Furman and Moelis, had knowledge of the attorney-client relationship between the Cozen Firm and Sheldrake Lofts.

00414727.2                                          32

238.    RCF, RD Mgt and L&M, through their principals, Ekstein, Furman and Moelis, had knowledge of the Cozen Firm's breaches of its attorney-client relationship with Sheldrake Lofts.

239.    Ekstein, Furman, Moelis, RCF, RD Mgt and L&M gave substantial assistance to the Cozen Firm in furtherance of the firm's beaches of its fiduciary duty to Sheldrake Lofts.

240.    Ekstein, Furman and Moelis directed the Cozen Firm in its conduct of negotiations with the Village, thereby giving substantial assistance to the Cozen Firm in its breach of fiduciary duty.

241.    As a result of the active role by Ekstein, Furman, Moelis, RCF, RD Mgt and L&M in the Cozen Firm's breach of its fiduciary duty to Sheldrake Estates, Sheldrake estates suffered substantial damages in an amount to be determined at trial, but believe to be in excess of One Million Dollars ($1,000,000).

**WHEREFORE** Plaintiff request Judgment as follows:

A.    On the First Cause of Action against RCF, for equitable subordination of RCF's claim and the transfer of its lien on property of the Debtor to the estate.

B.    On the Second Cause of Action against the Cozen Firm, for damages in an amount to be determined at trial but not less than One Million Dollars ($1,000,000);

C.    On the Third Cause of Action against RCF, RD Mgt, L&M, Ekstein, Furman and Moelis, for damages in an amount to be determined at trial but not less than One Million Dollars ($1,000,000);

D.    Plus interest, costs, expenses and attorney's fees; and

E.    Such further relief this Court may deem just and proper.

00414727.2                                    33

Dated:    New York, New York
          December 13, 2010

DAVIDOFF MALITO & HUTCHER LLP

By:_____
          David Wander
          605 Third Avenue, 34th Floor
          New York, NY 10158
          (212) 557-7200
          dhw@dmlegal.com

          Attorneys for Sheldrake Lofts LLC
          Debtor and Debtor in Possession

00414727.2                    34